Harry SOAP, Petitioner–Appellant,

v.

Charlie D. CARTER, and the Attorney
General of Oklahoma,
Respondents–Appellees.

No. 79–1125.

United States Court of Appeals,
Tenth Circuit.

Argued July 10, 1980.

Decided Oct. 24, 1980.

Rehearing Denied Dec. 4, 1980.

Janet L. Cox, Asst. Atty. Gen., Oklahoma City, Okl. (Jan Eric Cartwright, Atty. Gen., of Okl., Oklahoma City, Okl., with her on the brief), for respondents–appellees.

Leonard D. Munker, Federal Public Defender, Kansas City, Kan., for petitioner–appellant.

Before McWILLIAMS, BREITENSTEIN and SEYMOUR, Circuit Judges.

BREITENSTEIN, Circuit Judge.

Petitioner–appellant sought federal habeas corpus relief from his state court conviction of first degree manslaughter after a jury trial. The conviction was affirmed by the Oklahoma Court of Criminal Appeals in an unpublished opinion. Petitioner then pursued state post–conviction remedies. A state district court denied relief and its action was affirmed by the Oklahoma Court of Criminal Appeals. Having exhausted his state remedies, petitioner then filed a federal habeas corpus action in the Eastern District of Oklahoma. He appeals from an adverse ruling of that court. We granted a certificate of probable cause and appointed counsel for him. We affirm.

Petitioner was charged with the September, 1972, murder of Robert Duncan. Petitioner and the decedent were both Cherokee Indians. The homicide occurred at the home of Harry Duncan, a 61–year old Cherokee and a relative of Robert Duncan. Walter Stepp and Robert Duncan came to Harry Duncan's home in Robert Duncan's automobile. Stepp entered the home and saw petitioner and Harry Duncan talking. Petitioner left shortly thereafter. Harry Duncan and Walter Stepp stayed in the house. Both of them testified that they heard no altercations, shots or other unusual noises during the time that petitioner and Robert Duncan were outside. In a few minutes Harry and Stepp went outside and saw Robert Duncan on the ground.

At the preliminary hearing Harry testified that he saw petitioner and Robert fighting. At the trial he said that he did not. An ax was found near Robert's body. At the trial Harry testified through an interpreter that: "When he (petitioner) got through using it (the ax), he put it under the floor. He didn't see him use it." At a post–trial hearing Harry testified that he never saw petitioner with an ax in his hand or touch an ax during the night in question. The officers on arrival found a bloody ax partly concealed under a porch floor. The medical examiner said that the deceased had received blows on each side of the head or neck and had bled to death. He also said that the ax could have been used to strike the blows. No usable fingerprints were found on the ax.

Stepp testified that he saw petitioner standing next to someone lying on the ground. Petitioner chased Stepp away saying that "I am going to do the same thing to you." Harry said that he saw a gun near

the body and later denied that he did. Harry was afraid of petitioner, got a rifle, and shot to frighten petitioner. Petitioner was wounded and ran. About 15 minutes later, he encountered his brother, Bobby Soap, near the Harry Duncan home and his brother took him to a hospital. Bobby said that petitioner objected to being taken to the hospital.

The medical examiner said that decedent lived for about 15 minutes after the blows, and that death had occurred about 2:30 a. m. The witnesses differed greatly in the timing of various events that occurred during the evening. Bobby Soap fixed the time of his encounter with petitioner at 1:00–1:30 a. m. A neighbor testified that she saw petitioner at her home, not far from Harry Duncan's house about 1:30 a. m. and heard him again at her home about 20 minutes later. Petitioner denied killing Bob Duncan and said that all of the group were alive on the porch when he was shot and left. He said that he did not know who shot him.

This appeal presents three issues: (1) constitutional sufficiency of the evidence, (2) errors in translation resulting in denial of due process and right of confrontation, and (3) prosecutorial misconduct.

The four people at the Harry Duncan home were Harry, the petitioner, the decedent, and Walter Stepp. Harry and petitioner did not speak English and testified through an interpreter. Stepp did not. At the preliminary hearing Georgia Kent was used as an interpreter with the approval of defense counsel who stipulated that she was a neutral party. At the trial the Reverend Scott Bread was used as an interpreter without any objection and he acted as an interpreter for the testimony of government witness Harry Duncan and of the petitioner.

Petitioner's motion for a new trial asserted mistranslation of the testimony of Harry. A sister of the petitioner, Inola Soap, who spoke both Cherokee and English, testified that she was present at the trial and that interpreter Bread did not accurately translate the answers of Harry. She also said that after the trial Harry had told her that he did not say what Bread translated him as saying. The prosecution then called Harry and he denied the conversation with Inola Soap.

The question of the mistranslation was considered by the Oklahoma Court of Criminal Appeals. It pointed out that Harry's testimony at the best was confusing and contradictory and that his statement of the handling of the ax by petitioner was impeached by a contrary statement which Harry had made at the preliminary examination. The federal habeas judge treated the objections to the interpreter's translations as procedural errors raising no constitutional questions proper for consideration in federal habeas proceedings arising out of a state court criminal conviction.

■ The Sixth Amendment confrontation claim relates to witnesses Harry Duncan and Walter Stepp. Harry testified through an interpreter at both the preliminary hearing and the trial. Stepp testified at the pre–trial hearing, apparently without the use of an interpreter, and was thoroughly cross–examined. At the trial the prosecution announced that the sheriff's office had made an extensive search for Stepp and had been unable to find him to serve a subpoena requiring his appearance at the trial. By stipulation the transcript of the examination and cross–examination of Stepp at the preliminary hearing was read to the jury. This is not a case like *Barber v. Page*, 390 U.S. 719, 724, 88 S.Ct. 1318, 1321, 20 L.Ed.2d 255, where the prospective witness was in federal custody and the prosecution made no effort to have the witness available at the trial. Rather it is a case where the witness was actually unavailable. See Id. at 724–726, 88 S.Ct. at 1321–1322. Additionally, the defense consented to the use of the preliminary hearing transcript. Petitioner may not now invoke the Confrontation Clause.

■ Petitioner's claim of mistranslation raises no confrontation issue. At the preliminary hearing, and at the trial, the defense did not question the qualifications of

the interpreters and made no objection to their use. After conviction the defense claimed newly discovered evidence relating to mistranslation of part of Harry Duncan's testimony. Conflicting evidence was then presented and rejected by the trial court. We agree with the federal habeas court that rulings on the appointment and qualifications of interpreters do not reach constitutional proportions. See *Fairbanks v. Cowan*, 6 Cir., 551 F.2d 97, 99. Whatever problems there may be with the testimony of Harry Duncan go to the sufficiency of the evidence.

The 1979 decision of the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, considered the principles which must guide a federal habeas court in considering the sufficiency of the evidence to support a state court conviction. The Court said, Id. at 324, 99 S.Ct. at 2792:

> "We hold that in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254–if the settled procedural prerequisites for such a claim have otherwise been satisfied–the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."

The first question is whether the announced principle should be applied retrospectively. The decision of the federal habeas court was made December 29, 1978, six months before the Jackson decision.

In *Linkletter v. Walker*, 381 U.S. 618, 637, 85 S.Ct. 1731, 1741, 14 L.Ed.2d 601, the Court was confronted with the retrospective application of its decision relating to the admissibility of illegally obtained evidence. The issue arose in a federal habeas action to review a state conviction. The Court declined to apply the decision retrospectively. A number of later decisions have considered the problem. See *Williams v. United States*, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388; *Mackey v. United States*, 401 U.S. 667, 91 S.Ct. 1160, 28 L.Ed.2d 404; *Hankerson v. North Carolina*, 432 U.S. 233, 97 S.Ct. 2339, 53 L.Ed.2d 306; and *Harlin v. Missouri*, 439 U.S. 459, 99 S.Ct. 709, 58 L.Ed.2d 733. Whatever the rule on retrospectivity may be, we believe that it applies both to direct review of criminal convictions and to a federal habeas attack on a state court conviction. See *Williams*, 401 U.S. at 656, 91 S.Ct. at 1154.

In *Jackson* the court rejected the "no evidence" criterion of *Thompson v. Louisville*, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654, and held that a federal habeas court reviewing a state court conviction, must consider whether there is sufficient evidence to justify a rational finder of fact to find guilt beyond a reasonable doubt. The principle relates to the standard of review, not to the commission of the substantive offense. Without trying to reconcile the many differences of opinion on retrospectivity, we believe that the fair and best rule is that *Jackson* applies to all federal habeas proceedings to review state convictions when the federal habeas was not finally determined before *Jackson*. In our review of the instant case we apply *Jackson*.

Four Cherokee Indians were involved in the events with which we are concerned. The record indicates the probable drinking of alcohol. Harry Duncan and petitioner were in the house when the decedent and Stepp arrived. Stepp went in the house while decedent was still in the car. Petitioner left the house. A few minutes later Harry and Stepp went outside. They found petitioner standing over a body. No evidence showed the presence of any one else at the time. Stepp testified that petitioner threatened him and that he ran. Harry Duncan fired a shot. Petitioner was wounded. The evidence of the examining doctor, and the surrounding facts, justify a reasonable inference that decedent had been killed by two blows of the ax.

Testifying in his own behalf, petitioner said that he was at Harry's home and that Stepp and decedent drove up. He denied any knowledge of the ax, any assault on the decedent, and any threat to Stepp. He made no claim that any person, other than the four mentioned, was present.

The Oklahoma Court of Criminal Appeals said that the question was "whether there exists competent evidence from which the jury could reasonably have found the defendant guilty of First Degree Manslaughter." This is essentially the *Jackson* test. The Oklahoma court held there was such competent evidence. The federal habeas court referred to an Oklahoma decision, *Edwards v. State*, Okl.Cr., 476 P.2d 378, holding that the function of a court reviewing a criminal conviction is to ascertain "whether there is a basis, in evidence, on which the jury can reasonably conclude that the accused is guilty as charged." It held that a review of the trial transcript showed that the state submitted ample evidence to sustain the verdict.

■ The federal habeas court, acting before *Jackson*, did not state the governing criterion in the language of *Jackson* but it recognized that the evidence must suffice to justify a reasonable conclusion by the jury. From our review of the trial transcripts we are convinced that a rational trier of the facts could have found guilt beyond a reasonable doubt. The requirements of the *Jackson* decision are satisfied.

The original brief of the petitioner did not mention prosecutorial misconduct. The point was raised in a supplemental brief and oral argument. We disapprove of the practice of asserting new issues in reply or supplemental briefs, but in the circumstances of this case we shall consider the issue. Petitioner admits that no contemporaneous objections, as required by Oklahoma law, were made to the closing arguments of the prosecutor. In *Fay v. Noia*, 372 U.S. 391, 438–439, 83 S.Ct. 822, 848–849, 9 L.Ed.2d 837, the Court held that the contemporaneous objection rule did not apply when a defendant had deliberately bypassed orderly state court procedures or had not intentionally relinquished a known right or privilege. In *Wainwright v. Sykes*, 433 U.S. 72, 89, 97 S.Ct. 2497, 2507, 53 L.Ed.2d 594, the Court said that the *Fay v. Noia* rule encourages "sandbagging" on the part of defense lawyers who would gamble on the outcome of the state case with intent to raise constitutional claims in a federal habeas court. The Court went on to say, Id. at 90, 97 S.Ct. at 2508:

"The failure of the federal habeas courts generally to require compliance with a contemporaneous–objection rule tends to detract from the perception of the trial of a criminal case in state court as a decisive and portentous event. * * Any procedural rule which encourages the result that those proceedings be as free of error as possible is thoroughly desirable, and the contemporaneous–objection rule surely falls within this classification."

■ Petitioner has advanced no explanation of his failure to object at the trial or of his failure to raise prosecutorial misconduct in this court until he filed his reply brief. Federal courts have no supervisory powers over state trial proceedings. To present a federal constitutional question "[p]rosecutorial argument must be so egregious as to render the entire trial fundamentally unfair." *Cook v. Bordenkircher*, 6 Cir., 602 F.2d 117, 119. In the case at bar they were not of that character. In his brief petitioner says only that "[t]he prosecutor also came dangerously close to inflaming the passion and prejudice of the jury in referring to the defendant's Cherokee heritage and alcoholic lifestyle." Reply Br. p. 5. Close is not enough. The arguments must be considered in the context of the entire trial. Those present at the Duncan home were all Cherokees and had been drinking. The claim of prejudice because of racial statements, emphasizes, out of all proportion, a minor incident in the trial to which no objection was made.

■ A more serious objection goes to the statement of the prosecutor in closing argument that:

"I have no hesitancy at all to tell you that in my sincere and honest opinion, that this evidence does show beyond a reasonable doubt, that this man killed him, and I am convinced of that just as much as I am convinced that I am standing here and talking to you."

We have consistently disapproved the expression by a prosecutor of his personal opinion of guilt. See e. g. *United States v. Latimer*, 10 Cir., 511 F.2d 498, 503, and *United States v. Ludwig*, 10 Cir., 508 F.2d 140, 143. Those were federal cases and here we have federal habeas review of a state conviction. *Donnelly v. DeChristoforo*, 416 U.S. 637, 639, 94 S.Ct. 1868, 1869, 40 L.Ed.2d 431, says that the question in such circumstances is "whether the remarks, in the context of the entire trial, were sufficiently prejudicial to violate respondent's due process rights." One of the attacked remarks in Donnelly was the prosecutor's expression of his personal opinion of guilt. The Supreme Court reversed the federal appeals court reversal of a trial judge's denial of habeas. In so doing the Court said, Id. at 647, 94 S.Ct. at 1873:

> "The result reached by the Court of Appeals in this case leaves virtually meaningless the distinction between ordinary trial error of a prosecutor and that sort of egregious misconduct held in *Miller* and *Brady, supra*, to amount to a denial of constitutional due process."

In *Miller v. Pate*, 386 U.S. 1, 6–7, 87 S.Ct. 785, 787–788, 17 L.Ed.2d 690, the prosecution knowingly used false evidence. In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, the prosecution withheld evidence. The prosecutor's expression of personal belief was reprehensible and should not have been made, but there was no contemporaneous objection. At the most the statement of the prosecutor was a minor trial error which does not rise to the level of a constitutional deprivation of due process. See *Hayton v. Egeler*, 6 Cir., 555 F.2d 599, 604. Viewing the record as a whole, including the arguments, we are convinced that no constitutional right of the petitioner was violated.

Affirmed.

SEYMOUR, Circuit Judge, dissenting:

The prosecutor in this case made racially prejudicial remarks in his closing argument.

Because the Constitution does not permit appeals to racial prejudice that pose a serious threat to a fair trial, I must dissent.

In reviewing the conduct of a state prosecutor on writ of habeas corpus, we admittedly lack the broad supervisory powers we possess regarding conduct in a federal trial. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974). Our standard here is the narrower one of due process. *Id.*

Only those trial errors that constitute a "failure to observe the fundamental fairness essential to the very concept of justice" violate due process. *Lisenba v. California*, 314 U.S. 219, 236, 62 S.Ct. 280, 289, 86 L.Ed. 166 (1941). A prosecutor's appeal to racial prejudice can rise to an infirmity of that magnitude. *See Miller v. North Carolina*, 583 F.2d 701 (4th Cir. 1978); *Kelly v. Stone*, 514 F.2d 18 (9th Cir. 1975); *Haynes v. McKendrick*, 481 F.2d 152 (2d Cir. 1973). Such an appeal threatens the impartiality of the jury, which is a fundamental component of a fair trial. An effective appeal undermines the guarantee that a defendant shall have his case decided according to the evidence in the record, rather than on the basis of personal bias. Prejudicial argument by the prosecutor unfairly stacks the deck in the government's favor. As Judge Jerome Frank eloquently stated, it "summon[s] that thirteenth juror, prejudice," to its side. *United States v. Antonelli Fireworks Co.*, 155 F.2d 631, 659 (2d Cir.) (dissenting opinion), *cert. denied*, 329 U.S. 742, 67 S.Ct. 49, 91 L.Ed. 640 (1946). The introduction of racial prejudice into a trial furthers the impression that there are dual standards of justice in our country, one for whites and another for racial minorities, thereby impugning the concept of equal protection of the laws.[1] These reasons make apt our characterization of prosecutorial appeals to racial prejudice as "foul blow[s] which must be rejected by the courts." *United States v. Krohn*, 573 F.2d

---

1. As noted in *Haynes v. McKendrick*, 481 F.2d at 159, when racial prejudice is injected into a criminal trial, "the due process and equal pro-

tection clauses overlap or at least meet . . . ." *Accord, McFarland v. Smith*, 611 F.2d 414, 416 (2d Cir. 1979).

1382, 1389 (10th Cir.), *cert. denied, Hahn v. United States,* 436 U.S. 949, 98 S.Ct. 2857, 56 L.Ed.2d 792 (1978).

Although prejudicial arguments are foul blows, not every instance of prosecutorial misconduct rises to the level of a due process violation. The insignificance of a remark in the context of an entire trial, *United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 242, 60 S.Ct. 811, 853, 84 L.Ed. 1129 (1939); the effect of a curative instruction, *see Donnelly v. DeChristoforo,* 416 U.S. at 644, 94 S.Ct. at 1872; the motive of the prosecutor, *see United States v. Krohn,* 573 at 1389; or the presence of "overwhelming" evidence of guilt, *Cook v. Bordenkircher,* 602 F.2d 117, 120 (6th Cir.), *cert. denied,* 444 U.S. 936, 100 S.Ct. 286, 62 L.Ed.2d 196 (1979), are some of the factors courts have relied upon in ruling that a prejudicial argument did not so infect a trial with unfairness as to deny due process. A finding of fundamental unfairness, however, does not require proof beyond a reasonable doubt that the jury's evaluation was actually tainted with prejudice. "Because that contamination may affect the jury's evaluation of all the evidence before it, speculation about the effect of the error on the verdict is fruitless." *Miller v. North Carolina,* 583 F.2d at 708. Where "the evidence of guilt ... is not overwhelming ... the probability of prejudice [is] the correct test." *Haynes v. McKendrick,* 481 F.2d at 159.

On the facts as disclosed in this record, I am persuaded that the prosecutor's prejudicial remarks created a sufficient probability of impairment of the jury's impartiality so as to deny petitioner the fundamental fairness guaranteed him by the fourteenth amendment. In an effort to prove that petitioner, an Indian, had committed murder, the prosecutor introduced unwarranted racial remarks in his summation:

"I believe the evidence shows that you have got a fellow—and it isn't unusual—you know, it is sad to see, but when you see an Indian that drinks liquor, you see a man that can't handle it. There is just something about it that they can't man-age it. That's what I say to you happened this particular night."

Rec., vol. II, at 284. The prosecutor introduced a racial stereotype, hoping to utilize it to his advantage. He was attempting to try petitioner not as an individual on the facts of his case, but as a member of a racial group with allegedly bad character traits and lifestyle. This became even more apparent when the prosecutor commented at another point:

"You try to impress upon people that they can change—they should change, and there is a decent way of going through life without violence, without committing crimes and still you can enjoy life and obtain things and goals in your life, but some people just don't live that way, and they won't live that way. That's what you have in this case. You have a class of people and a situation that exists that you and I can't change irrespective of what we do ... but I submit to you that the facts surrounding this are typical of the community in which this accident occurred ... and there is nothing you and I can do to change that situation, other than you can suggest with your verdict in this case what you want to do, what kind of standard you want to ask or set in this country."

Rec., vol. II, at 290.

References to "a class of people" or to what typically occurs in an Indian "community" were absolutely irrelevant to the issue before the jury. Petitioner's right to be tried on the evidence was violated. This right underlies the rules of evidence, which have as their central purpose restricting the jury's consideration to evidence that is relevant and trustworthy. *Miller v. North Carolina,* 583 F.2d at 706. Prosecutorial appeals to racial prejudice of the nature which occurred here have properly been held unconstitutional when challenged in a habeas corpus proceeding. *See Miller v. North Carolina,* 583 F.2d 701; *Kelly v. Stone,* 9 Cir., 514 F.2d 18; *Haynes v. McKendrick,* 481 F.2d 152.

By repeatedly alleging that petitioner belonged to a class with a lifestyle different

from "you and I," the prosecutor aligned himself with the jury as separate and distinct from Indians. Such remarks have been held to violate due process. For example in *Haynes v. McKendrick*, 481 F.2d 152, the prosecutor had discussed racial characteristics of blacks as a group, instead of confining his remarks to the individual characteristics of the defendant. In ruling that these remarks went beyond the bounds of due process, the court stated:

"The argument of defense counsel relating to identification could justify in reply reference to the particular features which made him especially noticeable to a white person–such as his 'sideburns'–a reference that was made; it does not justify, in our opinion, the repeated references to 'colored people' *as a group* trying to straighten their hair, or wearing 'exotic hairdos,' or having sideburns that are not the type 'that we usually think of when we think of sideburns.' In other words, answer to the identification argument did not require jurors to view 'colored people' as an entity separate and apart from themselves, with the natural concomitant that the defendants would be viewed by the jury members as coming from a distinct, a different community from themselves."

*Id.* at 160 (emphasis in original).

The prosecutor in this case compounded his misconduct by interjecting his personal belief into the trial, stating in his closing argument:

"I have no hesitancy at all to tell you in my sincere and honest opinion, that this evidence does show beyond a reasonable doubt, that this man killed him, and I am convinced of that just as much as I am convinced that I am standing here talking to you."

Rec., vol. II, at 295. In *Young v. Anderson*, 513 F.2d 969, 971 (10th Cir. 1975), an appeal from a dismissal of a writ of habeas corpus, we declared that "statements expressing an advocate's personal belief in the merits of the case are to be deplored." As the majority opinion recognizes, we have consistently denounced such remarks by federal prosecutors as well. Even if not always construed as independent constitutional violations, prosecutorial expressions of personal belief have been considered constitutional error when coupled with other factors, including racial statements. *See Kelly v. Stone*, 514 F.2d 18. Here, the prosecutor's declaration of his personal belief as to petitioner's guilt increased the probability that the jury's deliberations were contaminated by prejudicial argument.

My conclusion that petitioner's due process rights were violated might be otherwise if there were present some of the mitigating considerations other courts have relied upon in denying habeas corpus relief for alleged prosecutorial misconduct. No curative instruction was given by the trial court. Nor can the prosecutor's statements be cast off as insignificant. They went to the heart of the case. Neither can it be said that the evidence of guilt was "overwhelming." The majority and the federal district court make no such assertion. The majority holds that "a rational trier of fact could have found guilt beyond a reasonable doubt." I do not necessarily disagree with this statement, but such a conclusion cannot be equated with saying that the evidence was overwhelming, which it was not.[2] All

---

2. For this reason, the prosecutor's misconduct cannot be considered harmless error. Although *Chapman v. California*, 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967), states that some constitutional errors might in a particular setting be so unimportant and insignificant as to be harmless, an error can be so classified only if it is "harmless beyond a reasonable doubt." *Id.* at 24, 87 S.Ct. at 828. Because the evidence of guilt here was not overwhelming, the jury might have reached a different verdict absent the prosecutor's prejudicial remarks. Under these circumstances harmless error cannot be presumed beyond a reasonable doubt. Moreover, the Court in *Chapman* recognized that "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." *Id.* at 23, 87 S.Ct. at 827. A prosecutorial appeal to racial prejudice may well fall within the category of constitutional violations to which the harmless error rule does not apply. The error may so color the jury's view toward every aspect of the evidence that it is impossible to determine the effect of the error. *See Miller v. North Carolina*, 583 F.2d at 708; *Haynes v. McKendrick*, 481 F.2d at 161.

880

the evidence was circumstantial. No one saw petitioner kill the victim. The testimony was confused and conflicting, and some of it supports the inference that petitioner did not and even could not have been responsible for the killing, while other persons could well have been.

It is true that defense counsel did not object at trial to the prosecutor's statements. However, that is not an obstacle to our consideration of the matter on writ of habeas corpus. Despite the Oklahoma contemporaneous objection rule, the Oklahoma Court of Criminal Appeals chose to review the closing argument in this case. When a state appellate court examines an alleged error despite the absence of an objection at trial, there is no procedural barrier to federal habeas corpus review. *See Cook v. Bordenkircher*, 602 F.2d at 119; *Miller v. North Carolina*, 583 F.2d at 705. Thus, *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), relied upon by the majority, does not apply. In *Wainwright*, the Court emphasized that the Florida appellate courts had refused to review the petitioner's claim because of the state's contemporaneous objection requirement. 433 U.S. at 85–86, 97 S.Ct. at 2505–2506. It was for this reason the claim could not be heard in a federal habeas corpus proceeding.

Unfortunately, the grim reality of racial prejudice continues to persist in our country. Although it is often beyond the courts' power to affect racial attitudes under our constitutional scheme, prosecutorial misconduct in the courtroom is subject to judicial scrutiny. If a defendant is to have the fair trial he is constitutionally guaranteed, judges must be resolute in shielding jurors from prejudicial arguments by misguided prosecutors who use racial prejudice instead of evidentiary facts to win convictions. As an appointed guardian of the Constitution, this court can ill-afford to go on record as holding the prejudicial arguments made here to be "a minor incident."

I would reverse the district court's dismissal of petitioner's writ of habeas corpus.