FILED
United States Court of Appeals
Tenth Circuit

October 1, 2007

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

        Plaintiff-Appellee/
Cross-Appellant,

    v.

ROBERTO SIERRA-ESTRADA, a/k/a
Chorizo,

        Defendant-Appellant/
Cross-Appellee.

Nos. 05-4086, 05-4117

(D. Utah)

(D.C. No. 2:02-CR-126-JTG)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **ALARCÓN**,[**] and **HENRY**, Circuit Judges.

A jury convicted Roberto Sierra-Estrada of conspiring to distribute

methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846. The district

court sentenced him to the mandatory minimum ten years' imprisonment. Mr.

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[**] The Honorable Arthur L. Alarcón , Senior Circuit Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation.

Sierra-Estrada appeals the district court's denial of (1) his motion to suppress inculpatory statements he made to Federal Bureau of Investigation (FBI) agents, (2) his motion to dismiss the indictment based on the government's deportation of a material witness, and (3) his motion for a mistrial based on prosecutorial misconduct during the rebuttal portion of the government's closing argument. The government cross-appeals Mr. Sierra-Estrada's sentence, arguing that the district court erred as a matter of law when it refused to impose a twenty-year mandatory minimum sentence under § 21 U.S.C. § 841(b)(1)(A). We exercise jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I. BACKGROUND

### A. FACTUAL BACKGROUND

On March 7, 2001, the FBI received a tip from a confidential informant that Mr. Sierra-Estrada and another individual, later identified as Gabino Sanchez, were planning to transport methamphetamine to Kansas City. Later that day, FBI agents set up surveillance outside Mr. Sierra-Estrada's apartment near Salt Lake City. During the surveillance, an FBI agent observed a black Lincoln Continental matching information given by the informant and saw Mr. Sierra-Estrada carry a red and white cooler into the apartment. When Mr. Sanchez left the apartment by himself in the Lincoln, the FBI notified the Utah Highway Patrol.

Utah Highway Patrol Troopers stopped Mr. Sanchez's vehicle for an equipment violation. During the stop, a drug detection dog indicated the presence

-2-

of drugs in a red and white cooler located on the passenger seat of Mr. Sanchez's vehicle. The officers discovered two packages containing approximately 382 grams of methamphetamine in a secret compartment created in the cooler's Styrofoam lining and arrested Mr. Sanchez.

Approximately a week-and-a-half after Mr. Sanchez's arrest, the FBI intercepted a telephone call between Mr. Sierra-Estrada and Leonel Acevedo-Torres, a suspected drug dealer who was the subject of a court-ordered wiretap in Riverside County, California. During the call, which was translated from Spanish into English by the FBI, Mr. Sierra-Estrada told Mr. Acevedo-Torres, in code, about Mr. Sanchez's arrest and the large amount of methamphetamine that had been confiscated by law enforcement. Mr. Sierra-Estrada further stated that, due in part to Mr. Sanchez's arrest, he would be unable to pay for drugs previously advanced by Mr. Acevedo-Torres.

On April 18, 2001, Mr. Sanchez was indicted for possession of methamphetamine with intent to distribute. The FBI subsequently conducted two interviews with him, the contents of which were memorialized in two FBI investigation reports ("FBI 302s"). Prior to the first interview, an FBI agent discovered a note in Mr. Sanchez's vehicle bearing Mr. Sierra-Estrada's cell phone number.

During the initial interview, Mr. Sanchez admitted he was transporting the methamphetamine seized by the Utah Highway Patrol to Kansas City. He did not,

-3-

however, mention Mr. Sierra-Estrada. He instead stated that he had traveled to the apartment complex where Mr. Sierra-Estrada lived to meet a man named "Pedro," who was not involved with his transportation of the methamphetamine. When the interviewing agents showed him a picture of Mr. Sierra-Estrada, Mr. Sanchez indicated that he had met him at a dance in Mexico but did not know his name or current whereabouts.

During the second interview, Mr. Sanchez again did not mention Mr. Sierra-Estrada. He provided that he had stopped at the apartment where Mr. Sierra-Estrada resided to better conceal the methamphetamine in a cooler he had purchased. According to Mr. Sanchez, he did not know the individuals at the apartment, and they were unaware he was carrying methamphetamine.

On November 8, 2001, Mr. Sanchez pleaded guilty to possession of methamphetamine with intent to distribute. In February 2002, he was sentenced to thirty-four months' imprisonment.

On February 28, 2002, the Immigration and Naturalization Service notified the FBI that it had taken Mr. Sierra-Estrada into custody on unrelated charges and that he was being held at the Summit County Jail. Because the FBI had been planning to arrest Mr. Sierra-Estrada based on "information that he was getting ready to transport a shipment of methamphetamine to South Dakota," it made arrangements to speak with him. Supp. Rec. vol. II, at 9.

On March 1, 2002, at approximately 7:30 p.m., two FBI agents met with

Mr. Sierra-Estrada in a room at the Summit County Jail. At the outset of the interview, which was conducted through an FBI Spanish-language interpreter, the agents advised Mr. Sierra-Estrada of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), and asked if he wanted to speak with them. In response, Mr. Sierra-Estrada asked, "I wonder if I could have access to a lawyer. Is it possible if I don't have money?" Supp. Rec. vol. II, at 14. The agents replied that "it was possible, all he had to do was ask for one, one would be provided to him. We would not interview him at that time. We would wait until a later time to do the interview." Id.

At approximately 7:42 p.m., the agents presented Mr. Sierra-Estrada with a Spanish-language "advice of rights" form explaining his Miranda rights. The form also advised Mr. Sierra-Estrada that he would waive his rights by signing it. After reading the form to himself, Mr. Sierra-Estrada inquired whether "he could get a lawyer in the future if he wanted one." Id. at 15. In response, one of the agents stated, "sure you can, as soon as you ask for one." Id. Mr. Sierra-Estrada then asked about the type of deal and sentence he would receive if he cooperated. The agents explained that they lacked the authority to discuss such matters, but would inform the prosecuting attorneys of all the information he provided. The agents also addressed Mr. Sierra-Estrada's concerns regarding the FBI's ability to ensure his safety if he cooperated.

Mr. Sierra-Estrada continued to ask the agents questions for around 35 to

40 minutes. During this time, Mr. Sierra-Estrada also re-read the advice of rights form, and was told by the agents "around five" times that the interview would stop as soon as he asked for an attorney. Id. at 17. At some point, Mr. Sierra-Estrada inquired whether "he could start talking and stop talking later." Id. at 18. The agents told him he could. At approximately 8:17 p.m., Mr. Sierra-Estrada told the agents he wanted to talk to them and signed the advice of rights form.

After doing so, Mr. Sierra-Estrada proceeded to confess to conspiring to distribute the methamphetamine found in Mr. Sanchez's car. Specifically, he told the agents that he created the hidden compartment inside the cooler in which the methamphetamine was discovered in exchange for $500 from Mr. Sanchez, that he placed the methamphetamine in the cooler, that he handed the cooler to Mr. Sanchez, and that he told Mr. Sanchez, who was nervous, to "take the methamphetamine and not to be afraid." Id. vol. VI, at 58. Mr. Sierra-Estrada also admitted that he was the person speaking to Mr. Acevedo-Torres on the intercepted phone call and explained the contents of the conversation to the agents.

On March 4, Mr. Sierra-Estrada spoke with the FBI agents for a second time. Once again, Mr. Sierra-Estrada was apprised of his Miranda rights through an interpreter and he signed a Spanish-language advice of rights form. During this interview, Mr. Sierra-Estrada confirmed his involvement in the transportation and distribution of illegal narcotics for many years.

## B. PROCEDURAL HISTORY

On March 2, 2002, Mr. Sierra-Estrada was indicted for conspiracy to distribute the methamphetamine hidden insider the cooler in Mr. Sanchez's vehicle.

Prior to trial, he filed a motion to suppress the inculpatory statements he made during his FBI interviews. He argued that he had effectively invoked his right to counsel at the outset of his initial interview and, consequently, the agents should have stopped their questioning until an attorney was provided.

On July 2, 2003, after holding an evidentiary hearing, the district court denied Mr. Sierra-Estrada's motion to suppress, stating that:

> [u]nder the totality of the circumstances, . . . I am convinced that this was not an invocation of the right to counsel. It was simply a matter of simple, careful questioning, all having to do with what might be provided in the future. I am satisfied that the answers . . . given by Agent Ross were appropriate, they were clear, and there is no doubt about the fact that if this defendant had asked for a lawyer at any time, he would have had one. Nothing prior to his execution of the document having to do with his rights and going ahead with questioning – by the time he had signed that he had a clear understanding that at any time he might invoke and ask for a lawyer. He never did. And this is a matter of the agents simply being careful. The time, 47 minutes, reflects not only careful handling of the matter, it reflects the necessity of interpretation of consideration and being sure that he understood the document. He looked at the document. He read it. He had it read to him. It was in Spanish. I am satisfied that this is an appropriate procedure and I am going to deny the motion to suppress the custodial statements, and that motion is denied.

Id. vol. III, at 13.

On August 15, 2003, Mr. Sierra-Estrada's trial counsel moved the district

-7-

court for authorization to travel to the prison where Mr. Sanchez was incarcerated in order to interview him. On August 25, 2003, the district court granted trial counsel's motion. Three days earlier, however, unbeknownst to trial counsel, the Bureau of Prisons released Mr. Sanchez from prison and turned him over to immigration officials for deportation. A memorandum from the Bureau of Prisons to the FBI indicated that Mr. Sanchez had been given 334 days of credit for time served in federal custody prior to sentencing and had completed his 34-month sentence on August 22, 2003.

On September 8, 2003, trial counsel moved for a continuance in order to secure Mr. Sanchez's presence at trial so that he could testify, and the government joined in the motion. The government also provided trial counsel for the first time with the FBI 302s from the two interviews it conducted with Mr. Sanchez. Inexplicably, these reports were not contained in the government's previous discovery disclosures. The district court granted Mr. Sierra-Estrada's motion.

An investigator for Mr. Sierra-Estrada eventually contacted Mr. Sanchez in Mexico via telephone. Mr. Sanchez, however, was unwilling to speak about the case. The FBI then contacted Mr. Sanchez, but he indicated that he was unwilling to testify for Mr. Sierra-Estrada. He also refused to allow the government or trial counsel to interview him in Mexico.

Mr. Sierra-Estrada moved to dismiss the indictment because Mr. Sanchez's deportation violated his Fifth Amendment right to due process and his Sixth

Amendment right to compulsory process. At a hearing on this motion, Mr. Sierra-Estrada suggested that, rather than dismissing the case, the district court could admit the previously undisclosed FBI 302 reports without regard to hearsay or foundation objections. The government agreed that it would not object to the admission of the FBI 302s at trial.

The district court ruled as follows:

> The motion to dismiss is denied subject to the discussion that we've had about an agreement that there is no bad faith in the sense of the United States Attorney's office having caused in any way the deportation. What might be said about the failure of an FBI agent to have revealed those 302 statements [prior to the September 8, 2003, hearing] is still a possibility of something that might be raised in cross-examination. But the most significant thing that could be raised is what was said by Mr. Sanchez in the two interviews with the FBI agent and that can come in. And with that understanding and the lack of bad faith on the part of the United States Attorney's Office, we'll go ahead and deny the motion subject to those conditions.

Id. vol. IV, at 34-35.

During a two-day trial, the government introduced evidence regarding (1) Mr. Sierra-Estrada's custodial statements, (2) the intercepted phone call between Mr. Sierra-Estrada and Mr. Acevedo-Torres, (3) the note from Mr. Sanchez's vehicle containing Mr. Sierra-Estrada's cell phone number, (4) the seizure of methamphetamine from the cooler in Mr. Sanchez's vehicle, and (5) testimony that Mr. Sierra-Estrada was seen outside of his apartment carrying a similar cooler. The FBI 302s were also admitted as evidence and the jury heard some additional testimony regarding Mr. Sanchez's statements. During the rebuttal

portion of the government's closing argument, the prosecutor stated the jury had a duty to be a part of the "shining city on the hill" described by President Reagan by connoting Mr. Sierra-Estrada as an unwelcome transgressor. Id. vol. VII, at 27.[1]

Defense counsel promptly objected. The district court overruled the objection stating, "It's argument. The jury can evaluate that. Go ahead." Id. at 28. Following closing arguments, the court instructed the jury that "[s]tatements, objections and arguments of counsel are not evidence." Id. at 33.

After the case was submitted to the jury, Mr. Sierra-Estrada moved for a mistrial based on the prosecutor's "shining city on the hill" statement. The district court denied the motion, and the jury convicted Mr. Sierra-Estrada of conspiracy to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846.

## C. SENTENCING

Following Mr. Sierra-Estrada's conviction, the United States Probation Office prepared a presentence investigation report ("PSR"). The PSR noted that Mr. Sierra-Estrada was subject to a mandatory minimum sentence of 10 years and a maximum sentence of life in prison. See 21 U.S.C. § 841(b)(1)(A). Because Mr. Sierra-Estrada had an offense level of 34 and a criminal history category of I,

---

[1] We set forth the prosecutor's statement in more detail below.

his recommended Sentencing Guidelines range was 151 to 188 months. However, because the government had filed an information prior to trial pursuant to 21 U.S.C. § 851 alleging that Mr. Sierra-Estrada was subject to a 20-year mandatory minimum sentence based on a prior California felony drug conviction, the PSR stated that the Guideline sentence was 20 years' imprisonment. See 21 U.S.C. § 841(b)(1)(A).

Mr. Sierra-Estrada objected to the 20-year enhanced mandatory minimum, arguing that the government failed to prove beyond a reasonable doubt that his prior California conviction was a felony. See 21 U.S.C. § 851(c) (stating that if a defendant "denies any allegation of the information of prior conviction . . . . the United States attorney shall have the burden of proof beyond a reasonable doubt on any issue of fact"). The district court held an evidentiary hearing, at which the government introduced certified copies of court records indicating that Mr. Sierra-Estrada had pleaded guilty to possessing heroin in violation of Cal. Health & Safety Code § 11352. These court records included: (1) a complaint filed in Riverside Superior Court, charging Mr. Sierra-Estrada with violating Cal. Health & Safety Code §§ 11351 (Counts I & III) and 11352 (Counts II and IV); (2) a criminal information, charging Mr. Sierra-Estrada with two counts of violating § 11352; (3) a copy of the docket, showing that Mr. Sierra-Estrada pleaded guilty to § 11352 and was granted 36 months probation; and (4) a disposition sheet purporting to show a history of Mr. Sierra-Estrada's case from arrest through

sentencing. These documents indicated that the offense of conviction was a felony.

Although Mr. Sierra-Estrada conceded that possession of heroin was a felony, he argued the government failed to prove that conviction beyond a reasonable doubt. For support, Mr. Sierra-Estrada introduced two probation reports, both with the word "felony" crossed out and granting probation to Mr. Sierra-Estrada. He argued these documents created an ambiguity as to whether he was convicted of a felony. The government offered no explanation why the word "felony" was crossed out.

At sentencing, the district declined to apply the enhanced mandatory minium. The court concluded that the recommended Guidelines range "overstated the seriousness of this" and sentenced Mr. Sierra-Estrada to the mandatory minimum ten years' imprisonment. Id. at 12.

Both parties filed timely notices of appeal.

## II. DISCUSSION

On appeal, Mr. Sierra-Estrada challenges the district court's denial of (1) his motion to suppress the inculpatory statements he made during his FBI interviews, (2) his motion to dismiss the indictment, and (3) his motion for a mistrial. We address these challenges in turn.

### A. INVOCATION OF RIGHT TO COUNSEL

Mr. Sierra-Estrada argues the district court erred in denying his motion to

suppress the inculpatory statements he made to the FBI because he clearly invoked his right to counsel during his initial FBI interview. In reviewing the denial of a motion to suppress, we examine the district court's factual findings for clear error, its legal determinations de novo, and we view the evidence in the light most favorable to the government. United States v. McKerrell, 491 F.3d 1221, 1224-25 (10th Cir. 2007). Accordingly, in assessing whether the district court properly determined that Mr. Sierra-Estrada failed to invoke the right to counsel, we accept the district court's factual findings regarding the words Mr. Sierra-Estrada used unless they are clearly erroneous. United States v. March, 999 F.2d 456, 459 (10th Cir. 1993). We review de novo, however, "[w]hether those words actually invoked the right to counsel." Id. (internal quotations and citation omitted).

Under Miranda, law enforcement officers must advise a suspect who is subjected to custodial interrogation that he has the right to remain silent, that statements can be used against him, that he has the right to counsel, and that he has the right to have counsel appointed. 384 U.S. at 467-73. Although a suspect may waive those rights, all questioning must stop if the suspect requests an attorney at any time during the custodial interrogation. Edwards v. Arizona, 451 U.S. 477, 484-85 (1981). Questioning may only resume if a lawyer has been provided or the suspect himself reinitiates communication with law enforcement. Id.

-13-

In Davis v. United States, 512 U.S. 452, 458-59 (1994), the Supreme Court set forth the standard for evaluating whether a suspect has invoked the right to counsel during a custodial interrogation. Under Davis, a suspect only invokes that right by "articulat[ing] his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." 512 U.S. at 459. "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," law enforcement questioning need not cease. Id. (emphasis in original). Furthermore, when a suspect's request is ambiguous or equivocal, law enforcement officers are not constitutionally required to clarify that statement, though it may be "good police practice" to do so. Id. at 461.

In application, these principles indicate that statements contemplating the invocation of the right to counsel are not sufficient to actually invoke the right to counsel. See id. at 462 (holding that the defendant failed to unambiguously request counsel when he stated, "Maybe I should talk to a lawyer"); United States v. Zamora, 222 F.3d 756, 765-66 (10th Cir. 2000) (defendant's statement that "I might want to talk to an attorney" was not a clear invocation); Burket v. Angelone, 208 F.3d 172, 198 (4th Cir. 2000) (holding "I think I need a lawyer" was not a clear invocation); Diaz v. Senkowski, 76 F.3d 61, 63-65 (2d Cir. 1996)

-14-

(holding "I think I want a lawyer" and "Do you think I need a lawyer?" were not clear invocations). Rather, to invoke the right to counsel, a statement must contain "the clear implication of a present desire to consult with counsel." Lord v. Duckworth, 29 F.3d 1216, 1221 (7th Cir. 1994). Compare United States v. Johnson, 400 F.3d 187, 197 (4th Cir. 2005) (holding that answering "no" in response to "Do you want to make a statement at this time without a lawyer?" was a clear invocation) with United States v. Doe, 170 F.3d 1162, 1166 (9th Cir. 1999) (holding that "What time will I see a lawyer?" was not a clear invocation).

Applying the Supreme Court's decision in Davis to his case, Mr. Sierra-Estrada first contends he unambiguously invoked his right to counsel at the outset of his first FBI interview when he inquired, "I wonder if I could have a lawyer. Is it possible if I don't have money?" Supp. Rec. vol. II, at 14. We disagree. From an objective standpoint, this statement was ambiguous at best because it does not suggest a present desire to speak with counsel. Instead, the plain language suggests that Mr. Sierra-Estrada was inquiring into whether his right to an attorney was contingent upon his ability to pay for one. See Lord, 29 F.3d at 1220-21 (holding that defendant's statement that "I can't afford a lawyer but is there anyway I can get one?" was not a clear invocation of the right to counsel). This interpretation is particularly reasonable in light of Mr. Sierra-Estrada's failure to request counsel or ask the agents to stop the interview after the agents responded to his statement by explaining he would have an attorney as soon as he

-15-

"ask[ed] for one." Supp. Rec. vol. II, at 17.

Alternatively, Mr. Sierra-Estrada contends that a reasonable officer would have understood him to have requested counsel prior to waiving his Miranda rights because he referenced an attorney multiple times over the forty-seven minutes preceding his waiver, he had no understanding of American laws, and he could not speak English. But an examination of the circumstances surrounding Mr. Sierra-Estrada's waiver indicates just the opposite. First, Mr. Sierra-Estrada's additional inquires as to whether "he could get a lawyer in the future if he wanted one" and "start talking and stop talking later," like his inquiry at the outset of his interview, suggest that he was seeking to clarify his right to counsel, not actually invoking it. Supp. Rec. vol. II, at 18, 45; see United States v. Uribe-Galindo, 990 F.2d 522, 524, 526-27 (10th Cir. 1992) (holding that a defendant asking "whether he could have an attorney later on if he asked for one" did not invoke the right to counsel). Second, there is no evidence that Mr. Sierra-Estrada's request for counsel was lost in translation; an FBI interpreter was present throughout the interview and Mr. Sierra-Estrada agreed both orally and in writing to waive his Miranda rights after being advised of those rights in his native language. Given this evidence, we agree with the district court that the amount of time – forty-seven minutes – leading up to Mr. Sierra-Estrada's waiver of his Miranda rights, "reflects . . . careful handling of the matter" by the FBI. Supp. Rec. vol. III, at 13. Accordingly, Mr. Sierra-Estrada did not invoke his

right to counsel.

## B. Deportation of Gabino Sanchez

Mr. Sierra-Estrada also contends the district court erred in denying his motion to dismiss the indictment because his Fifth Amendment due process rights and his Sixth Amendment compulsory process rights were violated when the government deported Mr. Sanchez from the United States. At trial, the defense theory was essentially that Mr. Sierra-Estrada had no knowledge of the methamphetamine discovered in Mr. Sanchez's car. Mr. Sierra-Estrada contends Mr. Sanchez would have corroborated this claim because Mr. Sanchez did not implicate Mr. Sierra-Estrada during his FBI interviews.

A district court's refusal to dismiss to an indictment is reviewed for an abuse of discretion. United States v. Alcaraz-Arellano, 441 F.3d 1252, 1265 (10th Cir. 2006). A district court abuses its discretion if its decision "is based upon an error of law or a clearly erroneous finding of fact." United States v. Lin Lyn Trading, Ltd., 149 F.3d 1112, 1117 (10th Cir. 1998) (internal quotation marks omitted).

To obtain relief from the deportation of a potentially favorable witness, a defendant must make "some plausible showing of how [his] testimony would have been both material and favorable to his defense." United States v. Valenzuela-Bernal, 458 U.S. 858, 873 (1982); United States v. Caballero, 277 F.3d 1235, 1241 (10th Cir. 2002). In addition to materiality, we have held that a

-17-

defendant must also "demonstrate governmental bad faith to obtain an order dismissing [his] indictment." Caballero, 277 F.3d at 1242. Here, however, we need not decide whether Mr. Sierra-Estrada met his burden to show bad faith on the part of the government because the testimony of Mr. Sanchez was not material. Id. ("[F]ailure to show the materiality of . . . lost testimony absolves us of examining the bad faith prong."). Evidence is material "only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." Valenzuela-Bernal, 458 U.S. at 874. There is no such likelihood here.

First and foremost, the evidence that Mr. Sierra-Estrada conspired to distribute methamphetamine can only be described as overwhelming. This evidence included Mr. Sierra-Estrada's confession to the FBI that he created the hidden compartment in the cooler in which the methamphetamine was found for $500, that he placed the methamphetamine in the cooler, and that he directed Mr. Sanchez to "take the methamphetamine and not to be afraid." Supp. Rec. vol. VI, at 58. The government also introduced evidence that Mr. Sanchez's car had been seen leaving Mr. Sierra-Estrada's apartment, that Mr. Sierra-Estrada had been observed carrying a cooler similar to the one in which the methamphetamine was discovered into his apartment, that Mr. Sierra-Estrada discussed Mr. Sanchez's arrest during an intercepted phone call, and that a napkin discovered in Mr. Sanchez's car contained Mr. Sierra-Estrada's phone number.

Furthermore, we note that the FBI 302s detailing Mr. Sanchez's statements to the FBI were introduced at trial. Because the jury convicted Mr. Sierra-Estrada notwithstanding the presence of those statements, we think it is highly unlikely the jury would have rendered a different verdict had it heard Mr. Sanchez testify. Accordingly, the district court did not abuse its discretion in denying Mr. Sierra-Estrada's motion to dismiss his indictment.

## C. PROSECUTORIAL MISCONDUCT

Mr. Sierra-Estrada also contends the district court erred in denying his motion for a mistrial based on the rebuttal portion of the prosecutor's closing argument. There, the prosecutor stated:

> Tomorrow, our nation lays to rest President Reagan. Those of you who were alive during the presidency will remember he often talked about America being a shining city on the hill. We stand for something. We stand for the right to have a jury trial when you're accused by the United States of America of a crime. That doesn't mean that the jury trial has to find beyond any doubt that you're guilty. It's beyond a reasonable doubt. Your duty, as you retire to deliberate, is to be part of that city on the hill. Tell Sierra-Estrada that coming to our country to deal methamphetamine, to deal heartache, to deal heartbreak, to deal destruction is wrong and we will not stand for it.

Id. vol VII, at 27-28 (emphasis added).

Mr. Sierra-Estrada asserts that the prosecutor's reference to President Reagan's "city on the hill" "suggested to the jury that it had a civic duty to convict." Aplt's Br. at 18. He also contends the prosecutor's reference to "our country" emphasized that Mr. Sierra-Estrada "came from a foreign country, spoke a foreign language, and was not an American citizen," and thereby "invite[d] the

-19-

jury to . . . convict on the basis of [his] ethnicity." Id. at 20 (emphasis added).

Because the prosecutor's statements arguably involved ethnic innuendo, Mr. Sierra-Estrada suggests that we cannot apply harmless error review and that his conviction should be reversed without examining the prejudicial effect of those statements, if any. See McCleskey v. Kemp, 481 U.S. 279, 309 & n.30 (1987) (stating that "[b]ecause of the risk that the factor of race may enter the criminal justice process, we have engaged in 'unceasing efforts' to eradicate racial prejudice from our criminal justice system" and that "prosecutorial discretion cannot be exercised on the basis of race"); *United States v. Saccocia*, 58 F.3d 754, 774 (1st Cir. 1995) ("Due to the singular importance of keeping our criminal justice system on an even keel, respecting the rights of all persons, courts must not tolerate prosecutors' efforts gratuitously to inject issues like race and ethnicity into criminal trials.").

We disagree with Mr. Sierra-Estrada's contention that harmless error review is unwarranted. Only in "rare cases" will an error be deemed "structural" and "thus require[] automatic reversal." Washington v. Recuenco, 126 S. Ct. 2546, 2551 (2006). "If the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other constitutional errors that may have occurred are subject to harmless-error analysis." Neder v. United States, 527 U.S. 1, 8 (1999) (alteration and internal quotation marks omitted).

Because Mr. Sierra-Estrada objected contemporaneously and later moved

-20-

for a mistrial based on the prosecutor's statements, we review the district court's decision for abuse of discretion. United States v. Gabaldon, 91 F.3d 91, 94 n.2 (10th Cir. 1996).

Thus, in examining a prosecutor's allegedly improper statements, we generally apply a two-part test. United States v. Harlow, 444 F.3d 1255, 1265 (10th Cir. 2006). We first determine whether the statements were indeed improper. United States v. Martinez-Nava, 838 F.2d 411, 416 (10th Cir. 1988). We then assess whether the statements warrant reversal, examining "the curative acts of the district court, the extent of the misconduct, and the role of the misconduct within the case as a whole." United States v. Pulido-Jacobo, 377 F.3d 1124, 1134 (10th Cir. 2004); see also Soap v. Carter, 632 F.2d 872, 878 (10th Cir. 1980) (Seymour, J., dissenting) (considering the significance of the statement in the context of the trial as a whole, the presence of curative instructions, the prosecutor's motive, and the presence of overwhelming evidence of guilt). In considering these factors, we must be mindful that "[t]he Supreme Court has articulated different harmless-error standards, depending upon whether the error is of constitutional dimension." Harlow, 444 F.3d at 1265 (internal quotation marks omitted).

Non-constitutional errors are harmless unless they have "a 'substantial influence' on the outcome or leave[] one in 'grave doubt' as to whether [they] had such effect." United States v. Rivera, 900 F.2d 1462, 1469 (10th Cir. 1990) (en

-21-

banc) (quoting Kotteakos v. United States, 328 U.S. 750, 765 (1946)).  In contrast, most constitutional errors may be deemed harmless only if the reviewing court is convinced beyond a reasonable doubt that the errors did not affect the outcome of the trial.  Harlow, 444 F.3d at 1265.  With regard to prosecutorial misconduct, the harmless error standard that we must apply depends upon the kind of misconduct involved.  Compare id. (treating vouching as a non-constitutional error and examining "whether it had a substantial influence on the outcome, or leaves us in grave doubt as to whether it had such an effect") with United States v. Rahseparian, 231 F.3d 1267, 1275 (10th Cir. 2000) (applying the beyond a reasonable doubt standard when the prosecutor commented on the defendant's failure to testify).

In this appeal, the government does not defend the prosecutor's statements on appeal.  Instead, it contends that "it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict absent the allegedly improper statement."  Aple's Br. at 26.  See also United States v. Kornegay, 885 F.2d 713, 719 (10th Cir. 1989) ("There is no need to examine in depth the existence of error where the record convincingly shows that the asserted error, whether or not actually error, was harmless beyond a reasonable doubt."); cf. United States v. Doe, 903 F.2d 16, 27-28 (D.C. Cir 1990) (applying the beyond a reasonable doubt standard to prosecutor's reference to race in closing argument).

Considering the trial as a whole, we agree with the government that

-22-

the prosecutor's statements – proper or not – were harmless beyond a reasonable doubt. First, the district court ameliorated the effect of the prosecutor's statements by instructing the jury that the "statements, objections and arguments of counsel are not evidence." Supp. Rec. vol. VII, at 33. See United States v. Broomfield, 201 F.3d 1270, 1277 (10th Cir. 2000) (concluding that prosecutor's statement did not influence the jury and noting that "[t]he court also instructed the jurors that the statements and arguments of counsel are not to be considered evidence in the case"). Second, the evidence of Mr. Sierra-Estrada's guilt, especially his confession to the FBI that he created the hidden compartment in the cooler, sold the cooler to Mr. Sanchez for $500, placed the methamphetamine inside the cooler, and directed Mr. Sanchez to transport the methamphetamine to Kansas City, was overwhelming.

Under these circumstances, the prosecutor's statements, thought ill-advised because of the potential ethnic innuendo, were not "flagrant enough to influence the jury to convict on grounds other than the evidence presented." United States v. Meienberg, 263 F.3d 1177, 1180 (10th Cir. 2001) (internal quotation marks omitted). This being the case, we conclude that any misconduct was harmless beyond a reasonable doubt.

D. GOVERNMENT'S CROSS-APPEAL

In its cross-appeal, the government challenges the district court's

-23-

decision not to apply a twenty-year mandatory minimum sentence under 21 U.S.C. § 841(b)(1)(A). That statute provides in part that, if a person is convicted of distributing methamphetamine in violation of § 841(a)(1), "after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 20 years." 21 U.S.C. § 841(b)(1)(A). A "felony drug offense" is defined as "an offense that is punishable by imprisonment for more than one year under any law of the United States . . . that prohibits or restricts conduct relating to narcotic drugs, marihuana, anabolic steroids, or depressant or stimulant substances." Id. § 802(44).

In the event a defendant challenges the existence of a prior conviction, the government must prove the alleged felony beyond a reasonable doubt. Id. § 851(c)(1) ("If the person denies any allegation of the information of prior conviction, or claims that any conviction alleged is invalid, . . . . the United States attorney shall have the burden of proof beyond a reasonable doubt on any issue of fact."). "[F]or purposes of determining a felony conviction, what matters is not the actual sentence which the defendant received, but the maximum possible sentence." *United States v. Williams*, 442 F.3d 1259, 1261 (10th Cir. 2006) (alteration and internal quotation marks omitted).

Here, the government contends that it met this burden by proving

-24-

beyond a reasonable doubt that Mr. Sierra-Estrada was convicted in a California state court of possessing heroin in violation of California Health & Safety Code § 11352. Nevertheless, the government asserts, the district court erroneously relied on the sentence that he actually received, a 49-day jail term, in characterizing the conviction as a misdemeanor that could not be used to enhance his sentence.[2]

In response, Mr. Sierra-Estrada does not dispute that a conviction under California Health & Safety Code § 11352 for possession of heroin would constitute a "prior conviction for a felony offense" under 21 U.S.C. 841(b)(1)(A). However, he maintains, the record does not establish beyond a reasonable doubt that he was convicted of that offense. He further contends that the district court based its refusal to apply the enhanced

---

[2] We note the government's opening brief in its cross-appeal is rife with error. First, as noted by Mr. Sierra-Estrada, the government states that "[i]t is undisputed that the court records establish that Sierra-Estrada was convicted of violating Cal. Health & Safety Code § 1135**1**" Aple's Br. at 44 (emphasis added); however, "[t]he issue at the evidentiary hearing was whether Mr. Sierra-Estrada had been convicted under § 1135**2**, not § 1135**1**." Aplt's Reply Br. at 29. In its reply brief, the government "apologizes for this obvious factual error," but maintains that "this error has no impact on the legal analysis" because § 11352, like § 11351, qualifies as a "prior conviction for a felony drug offense" under 21 U.S.C. § 841(b)(1)(A). Gov't Reply Br. at 3-4.

Second, as pointed out by Mr. Sierra-Estrada, the document attached to the government's brief containing the caption "Consolidated Superior and Municipal Courts of Riverside County" was not introduced or discussed in the evidentiary hearing. Aplt's Reply Br. at 22 n.10. Thus, this document is <u>not</u> properly before the court.

twenty-year minimum on the government's failure of proof. As a result, he concludes, the district court's erroneous reference to the length of his actual sentence in characterizing the offense as a misdemeanor does not entitle the government to relief.

1.  *Standard of Review*

We review de novo the question of whether a rational trier of fact could find the evidence of a prior conviction sufficient to enhance a defendant's sentence under § 841(b)(1)(A). See United States v. Green, 175 F.3d 822, 834 (10th Cir. 1999). We view the evidence and all reasonable inferences therefrom in the light most favorable to the verdict. See id.

2. *Sufficiency of the Evidence*

At sentencing, the government presented (1) the original felony complaint alleging that Mr. Sierra-Estrada violated Cal. Health & Safety Code §§ 11351 and 11352; (2) the information charging him with a violation of § 11352; (3) the docket report showing that he pleaded guilty to § 11352; (4) the disposition record showing that he pleaded guilty to § 11352; and (5) a California booking photograph of Mr. Sierra-Estrada.

Upon considering this evidence, the district court first noted that "the matter of the enhancement from ten years to 20 years turns upon whether or not the prior offense was sentenced as a felony or as a misdemeanor." Rec.

vol. III, at 10 (emphasis added). The court continued:

> I have looked at all of the documents, and I have a copy of the original felony complaint, the original felony information[,] and a copy of the docket sheet. But the final document, which seems to me makes the whole thing <u>ambiguous and troubles me</u>, is the document that is a form that is used in lieu of what we do in federal practice, issue a separate judgment and commitment, so that there will be no question about what the offense was and what the sentence was.
>
> I have two documents. One is the original and one is the amended form[,] and they are Exhibits A and B. The word felony is crossed out in both of those forms, so it is not quite correct to say that there is not any basis for questioning it.
>
> And then the sentence goes on to sound very much like a misdemeanor sentence. It is a sentence of 49 days in jail and then probation, probation after a fine of $50 and another amount in the amount of $85. <u>I can't tell for sure what happened.</u> It was presented at the hearing that this was a plea bargain and ended up being a felony conviction. It sure looks that way. There is nothing to the contrary, other than the fact that the document, the operative document that I am looking at, provides for 49 days of time, $135, including the $50 fine, and various indications about reporting to a probation officer.
>
> <u>I regard the matter as ambiguous. I regard the prior history in Riverside, California as evidencing sentencing for a misdemeanor.</u> That is what it appears to me based upon the document and the testimony at trial.

<u>Id.</u> vol. III, at 10-12 (emphasis added).

We agree with Mr. Sierra-Estrada and the district court that a factfinder could conclude that the evidence was insufficient to establish beyond a reasonable doubt that he was convicted of the felony of possession of heroin in violation of California Health & Safety Code §

-27-

11352.  We acknowledge that the government's submission of the docket report and disposition record indicating that he pleaded guilty to a § 11352 offense would ordinarily be convincing evidence of a conviction.  However, as Mr. Sierra Estrada observes, the government failed to introduce evidence of a final judgment.  The absence of such a judgment is significant because California law provides that "[a] copy of the judgment of conviction *shall* be filed with the papers in the case."  See Cal. Penal Code § 1207 (emphasis added).

Moreover, in the absence of a final judgment, the fact that the word "felony" was crossed out in the probation reports—a matter that the government failed to explain —supports the inference that Mr. Sierra-Estrada "entered into plea negotiations with the prosecutor and ultimately pled [sic] to a misdemeanor."  Aplt's Reply Br. at 35 n.16.  See Green, 175 F.3d at 833-36 (reversing district court because government failed to prove beyond a reasonable doubt that defendant had committed two prior felony convictions because the felonies were in names used by the defendant as aliases and the government did not produce any physical evidence – like a picture or fingerprints – linking the defendant to the prior convictions); see also United States v. Stallings, 301 F.3d 919, 921 (8th Cir. 2002) (holding that the district court's reliance on a prior California conviction to enhance a defendant's sentence was improper after it concluded that "judgment was

-28-

never properly entered against [the defendant]").

A transcript of the plea hearing would have been helpful. "[T]he court's oral pronouncement of judgment . . . . controls over the clerk's minute order . . . ." People v. Farell, 28 Cal. 4th 381, 384 n.2 (2002); see also People v. Mesa, 14 Cal. 3d 466, 471 (1975) ("[A] discrepancy between the judgment as orally pronounced and as entered in the minutes is presumably the result of clerical error."). However, the government conceded at sentencing that it did not attempt to procure a plea hearing transcript.

We agree with Mr. Sierra-Estrada that the district court based its refusal to impose the 20-year enhanced sentence under § 841(b)(1)(A) in part on the government's failure to prove beyond a reasonable doubt that he was actually convicted of a felony under California Health & Safety Code § 11352. See Rec. vol. III, at 11-12 ("I regard the matter as ambiguous. I regard the prior history in Riverside, California as evidencing sentencing for a misdemeanor. That is what it appears to me based upon the document and the testimony at trial."). Accordingly, the district court's erroneous statement that "the matter of the enhancement from ten years to 20 years turns upon whether or not the prior offense was sentenced as a felony or as a misdemeanor," Rec. vol. III, at 10 (emphasis added), does not entitle the government to relief. Even if the district court had not so erred, the

-29-

ambiguities it noted establish a reasonable doubt regarding the alleged felony conviction.

## III. CONCLUSION

Therefore, we AFFIRM the district court's denial of Mr. Sierra-Estrada's motions to suppress inculpatory statements, dismiss the indictment, and grant a mistrial. We also AFFIRM the district court's imposition of a ten-year sentence.

Entered for the Court,

Robert H. Henry

Circuit Judge